UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JUDY DWYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 11-12048-JGD |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## CROSS-MOTIONS REGARDING DENIAL OF
## SOCIAL SECURITY DISABILITY INSURANCE BENEFITS

July 31, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Judy Dwyer ("Dwyer") has brought this action pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3),

challenging the final decision of the Commissioner of the Social Security Administration

(the "Commissioner") denying her claim for Social Security Disability Insurance

("SSDI") benefits.  The matter is presently before the court on the "Plaintiff's Motion to

Reverse or Remand to Social Security Administration" (Docket No. 9), by which the

plaintiff is seeking an order reversing the Commissioner's decision or, alternatively,

remanding the matter to the Social Security Administration for further administrative

proceedings.  It is also before the court on the "Defendant's Motion to Affirm the

Commissioner's Decision" (Docket No. 11), by which the Commissioner is seeking an order affirming his decision to deny Dwyer's claim for benefits. At issue is whether the Administrative Law Judge ("ALJ"), in reaching his decision that Dwyer was not disabled, committed reversible error not only by concluding that Dwyer's treatment regimen was "conservative," but also by relying on the fact that the treatment regimen was "conservative" in determining that Dwyer was not disabled, ignoring information contained in an April 2009 Function Report, and rendering improper and inconsistent findings with respect to the weight to be given to the opinion of a State agency consultant. As described below, this court finds that the ALJ committed no error and that his decision was supported by substantial evidence in the record. Accordingly, and for all the reasons detailed herein, the plaintiff's motion to reverse or remand is DENIED, and the Commissioner's motion to affirm is ALLOWED.

## II. STATEMENT OF FACTS[1]

Dwyer was born on October 7, 1958. (Tr. 39). She has a high school diploma and completed less than one year at a junior college. (Id.). During the time period from 1994 to August 2005, Dwyer was employed part-time as a custodian at a library and then worked full time doing production work for a jewelry distributor. (Tr. 47, 174). However, after undergoing treatment for cancer in 2005, she began to experience a variety of physical problems, including pain and discomfort throughout her body, and

---

[1] References to pages in the transcript of the record proceedings shall be cited as "Tr. __." The ALJ's decision shall be cited as "Dec." and can be found beginning at Tr. 11.

was subsequently diagnosed with neuropathy, fibromyalgia, carpal tunnel syndrome, and depression.  (Tr. 49-50, 173, 234, 283-84, 303, 305).  Dwyer claims that the pain, fatigue and other symptoms resulting from these conditions preclude her from working in any significant capacity.  (Tr. 37-39, 45-46, 49-50, 173).  Thus, although Dwyer returned to full time employment as a cashier for Ocean State Job Lot in November 2006 following her cancer treatments, she reduced her work to part-time beginning in October 2007, and stopped working altogether in June 2010, after she and her husband determined that part-time work was too much for her.  (Tr. 40, 46, 169).

## Procedural History

Dwyer filed an application for SSDI benefits on February 11, 2009, claiming that she had been unable to work since October 1, 2007 due to chronic pain and fatigue, numbness and pain in her feet, muscle soreness, stiffness, and decreased mobility caused by her fibromyalgia, neuropathy and carpal tunnel syndrome.  (Tr. 94-95, 173).   Her application was denied initially on May 28, 2009, and upon reconsideration on December 16, 2009.  (Tr. 96-98, 101-03).

The plaintiff subsequently requested and was granted a hearing before an ALJ, which took place on March 4, 2011.  (Tr. 33-93, 106-07, 119-24).  Dwyer, who was represented by counsel, appeared and testified at the hearing.  (Tr. 35, 39-83).  Additionally, the ALJ elicited testimony from a vocational expert ("VE"), who described  the plaintiff's past work experience and answered questions about a hypothetical claimant with the same age, education and employment background as Dwyer.  (Tr. 83-92).

3

Significantly, during the hearing, the ALJ questioned Dwyer about information she had provided to the Social Security Administration in an April 2009 Function Report. (Tr. 53-67). The ALJ reviewed Dwyer's responses to questions about her activities of daily living, and asked her whether she was still capable of performing the same types of tasks. (Tr. 53). In particular, the ALJ questioned Dwyer about the extent to which she could still complete errands, perform household chores, and engage in recreational activities such as reading, watching television and crafts. (Tr. 54-61). He also asked Dwyer whether she was continuing to engage in the same types of social activities that she had described in the Function Report, and whether there had been changes in the frequency with which she left her home and in her ability to walk outside. (Tr. 59-62). Dwyer contends that the manner in which the ALJ conducted the hearing was improper because he questioned her in an adversarial manner and ignored facts contained in the Function Report that supported her claim of disability. As detailed below, this court finds that the hearing was conducted appropriately, and that Dwyer's counsel had ample opportunity to fill in any gaps in the plaintiff's testimony.

After he finished examining Dwyer about the activities listed in the Function Report, the ALJ asked the plaintiff to describe what she currently does on a typical day and posed questions about the treatment she was receiving for her impairments. (Tr. 64-70). The plaintiff's attorney was then given an opportunity to ask his client questions. (Tr. 70-82). Notably, during his examination, Dwyer's counsel questioned the plaintiff further about the information contained in her Function Report, including but not limited

4

to, information about the impact of Dwyer's pain and other symptoms on her ability to

sleep and on her ability to perform the activities of daily living that were described in the

Report. (Tr. 71-80). Thus, to the extent Dwyer's counsel believed that the ALJ had

ignored or overlooked information in the Function Report, he was able to develop those

facts at the hearing.

On April 22, 2011, the ALJ issued a decision denying the plaintiff's application

for benefits. (Dec. 12; Tr. 22). Subsequently, on September 13, 2011, the Appeals

Council denied Dwyer's request for review. (Tr. 1-3). Thus, the plaintiff has exhausted

all of her administrative remedies, and the case is ripe for review by this court pursuant to

42 U.S.C. §§ 405(g) and 1383(c)(3).

## The ALJ's Decision

The ALJ concluded that from October 1, 2007 through the date of his decision on

April 22, 2011, Dwyer had not been "under a disability, as defined in the Social Security

Act," which defines "disability" as "the inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment or

combination of impairments that can be expected to result in death or that has lasted or

can be expected to last for a continuous period of not less than 12 months." (Dec. 1 and

Finding #7; Tr. 11, 22). See also 42 U.S.C. § 423(d)(1)(A). There is no dispute that the

ALJ, in reaching his decision that Dwyer was not disabled, applied the five-step

sequential evaluation required by 20 C.F.R. § 404.1520. The procedure resulted in the

following analysis, which is detailed in the ALJ's "Findings of Fact and Conclusions of Law." (See Dec. 3-12; Tr. 13-22).

The first inquiry in the five-step process is whether the claimant is "engaged in substantial gainful work activity[.]" Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). If so, the claimant is automatically considered not disabled and the application for benefits is denied. See id. In the instant case, the ALJ noted that the plaintiff continued to work on a part-time basis – about 20 hours per week– from the alleged date of onset of her disability until June 2010, and that her earnings during that time approached or surpassed the annual earnings threshold for substantial gainful activity. (Dec. 3; Tr. 13). Nevertheless, the ALJ decided to give Dwyer "the benefit of the doubt at this early stage of the sequential evaluation process," and determined that she had not engaged in substantial gainful work activity at any point since the alleged onset of her disability on October 1, 2007. (Id.; see also Finding #2; Tr. 13). Therefore, the ALJ proceeded to the next step in the sequential analysis.

The second inquiry is whether the claimant has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If not, the claimant is considered not disabled and the application for benefits is denied. See Seavey, 276 F.3d at 5. Here, the ALJ concluded that Dwyer suffered from several severe impairments, including fibromyalgia, sensory neuropathy in both feet, bilateral mild-to-

moderate carpal tunnel syndrome, and depression.  (Dec. Finding #3; Tr. 14).  Therefore, his analysis continued.

The third inquiry is whether the claimant has an impairment equivalent to a specific list of impairments contained in Appendix 1 of the Social Security regulations, in which case the claimant would automatically be found disabled.  See Seavey, 276 F.3d at 5; 20 C.F.R. § 404.1520(a)(4)(iii).  At this step, the ALJ concluded that Dwyer's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments.  (Dec. Finding #4; Tr. 14).  Accordingly, he proceeded to step 4 in the evaluation process.

The fourth inquiry asks whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work[.]"  Seavey, 276 F.3d at 5.  Accordingly, it was at this stage of the analysis that the ALJ determined the plaintiff's residual functional capacity ("RFC").  Specifically, the ALJ made the following finding:

> [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could only sit for 1 hour at a time for a total of 6 hours in an 8-hour workday, and could only stand/walk for 1 hour at a time for a total of 6 hours in an 8-hour workday.  In addition, the claimant could occasionally climb stairs and ramps, but could never climb ropes, ladders or scaffolds.  The claimant could only occasionally balance, stoop, crouch, kneel, or crawl, and could only occasionally perform grasping or twisting activities requiring gross manipulation.  The claimant would have to avoid concentrated exposure to hazards such as unprotected heights or moving/dangerous machinery, and would have to avoid concentrated exposure to extreme hot/cold temperatures, humidity, vibration, dusts, fumes, odors, and other pulmonary irritants.  Finally, the claimant would be able to

7

> understand and carry out simple, 3-4 step tasks, and would be able to maintain concentration, persistence, and pace for 2-hour increments over an 8-hour workday for 40 hours per week.

(Dec. Finding #5; Tr. 16).

As the ALJ explained in his discussion of the basis for his RFC assessment, the ALJ first determined that Dwyer had medically determinable impairments, which could reasonably be expected to cause the pain and other symptoms that the plaintiff claims have rendered her disabled.  (Dec. 7; Tr. 17).  He then went on to evaluate the intensity, persistence, and limiting effects of Dwyer's symptoms to determine the extent to which they limited the plaintiff's functioning.  (Id.).  Because the ALJ found that the plaintiff's statements about the extent of her symptoms and their impact on her functional abilities were not substantiated by the objective medical evidence, the ALJ assessed the credibility of Dwyer's statements in light of the record as a whole.  (See Dec. 7-11; Tr. 17-21).  The ALJ concluded that "the [plaintiff's] statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible" to the extent they were inconsistent with his finding regarding her RFC.  (Dec. 7; Tr. 17).

<u>The ALJ's Credibility Assessment</u>

As part of his assessment of Dwyer's credibility, the ALJ found that there were certain inconsistencies between Dwyer's allegations of disabling symptoms and the objective medical evidence.  (Dec. 8-9; Tr. 18-19).  For instance, the ALJ found it significant that on the occasions when Dwyer obtained treatment for her impairments, the

treatment she received was conservative in nature.  (Dec. 8; Tr. 18).  As the ALJ stated in

his decision:

> the undersigned notes that when the claimant has received treatment
> for her allegedly disabling impairments, such treatment has been
> essentially routine and conservative in nature.  The claimant has not
> been hospitalized as a result of any of her alleged impairments, nor
> has she been deemed to be a candidate for surgical intervention
> (Exhibits 1F-16F).  Instead, the claimant has been treated primarily
> with bracing, exercise, physical therapy, and a modest regimen of
> prescription medication (*Id.*).  The relatively routine and
> conservative nature of the claimant's treatment record does not tend
> to support her allegations of a disabling physical or mental
> impairment.

(Id.).  Dwyer challenges the ALJ's characterization of her treatment as "conservative,"

and argues that it lacks support in the medical evidence and constitutes improper lay

opinion.  As described below, however, this court finds that the ALJ's description of

Dwyer's treatment was appropriate and supported by substantial evidence in the record.

The ALJ also found that the plaintiff's credibility was undermined by evidence

regarding the effectiveness of her medications and by facts showing that she did not

consistently adhere to her prescribed course of treatment.  (Dec. 9; Tr. 19).  Specifically,

the ALJ cited to evidence from the record showing that the plaintiff had reported

improvement of her pain symptoms with the addition of Neurontin, and improvement of

her depression with the addition of Prozac.  (Id.).  Thus, the ALJ concluded that "[t]he

apparent efficacy of the claimant's prescribed course of treatment tends to indicate that

her symptoms are amenable to treatment, and are perhaps less severe than the claimant

has indicated."  (Id.).  Additionally, the ALJ noted that Dwyer's treating rheumatologist

repeatedly emphasized the importance of exercise and physical therapy, but that Dwyer had elected to stop physical therapy after she determined that it was ineffective, and she was not exercising or doing much activity. (Id.). The ALJ found that the plaintiff's "apparent noncompliance with recommended treatment does not enhance the credibility of her allegations," particularly when viewed in light of the evidence regarding the effectiveness of her prescribed medications. (Id.).

Other evidence which the ALJ considered in connection with his assessment of Dwyer's credibility included evidence regarding Dwyer's daily activities and evidence concerning the plaintiff's work activities after the alleged onset date of her disability. (Dec. 9-10; Tr. 19-20). The ALJ emphasized that despite Dwyer's claim of disabling symptoms, the record showed that she was able to perform light household chores such as washing dishes, sweeping, vacuuming and shopping, that she was able to watch television, read magazines and engage in crafts, and that she had no difficulty driving. (Dec. 9-10; Tr. 19-20). He also found it significant that the plaintiff had worked for more than three years after the alleged onset date of her disability, at a cashier's job which required her to remain standing at all times and involved "scanning and bagging" customers' purchases. (Dec. 10; Tr. 20). The ALJ stated that while he had given Dwyer the benefit of the doubt by finding that her employment did not amount to substantial gainful activity, her ability to perform such work "does not tend to enhance the credibility of her allegations." (Id.). He also concluded that while the plaintiff's impairments had

more than a minimal impact on her ability to perform work related activities, her

symptoms did not limit her to the degree alleged.  (Id.).

The ALJ's Consideration of Opinion Evidence

After evaluating the plaintiff's credibility regarding her subjective complaints of

pain and other symptoms, the ALJ considered the opinions of Dwyer's primary care

physician, Dr. Laurie DeMaria, and two State agency consultants, Dr. Beth Schaff and

Dr. Michael Meliszewski, and described how he weighed those opinions in connection

with his finding regarding the plaintiff's RFC.  (Dec. 10-11; Tr. 20-21).  Dwyer does not

take issue with the ALJ's decision as to the weight given to the opinions of Dr. DeMaria

and Dr. Meliszewski.  However, despite the fact that the ALJ ultimately concluded that

Dwyer was more limited than Dr. Schaff opined, Dwyer contends that the ALJ's decision

to credit Dr. Schaff's opinion was internally inconsistent and undermines his conclusion

that Dwyer was not disabled.

The ALJ first described the opinions of Dwyer's primary care physician, Dr.

Laurie DeMaria, who completed assessments of the plaintiff's physical and mental RFC.

(Dec. 10; Tr. 20).  He then stated that he was giving Dr. DeMaria's opinions "some

weight" based on her treating relationship with the plaintiff.  (Id.).  However, he further

explained that Dr. DeMaria's assessment of Dwyer's physical limitations was

inconsistent with objective and subjective evidence contained in the record, and that her

assessment of Dwyer's mental limitations was not supported by any of the mental health

professionals who had treated or examined the plaintiff.  (Dec. 10-11; Tr. 20-21).  For

11

example, although Dr. DeMaria opined that Dwyer could not "drive automotive equipment," the plaintiff had reported that she had no difficulty driving her car.  (Id.). Accordingly, the ALJ concluded that while Dr. DeMaria's opinion should be given "some weight," he decided to credit it only to the extent that it was consistent with his assessment of Dwyer's  RFC.  (Dec. 11; Tr. 21).

Following his evaluation of Dr. DeMaria's opinions, the ALJ turned to the opinion of Dr. Schaff.  (Id.).  Significantly, after reviewing the substance of Dr. Schaff's assessment regarding the plaintiff's physical RFC, the ALJ stated as follows:

> The undersigned gives this opinion significant weight, as it is well-supported by the objective medical evidence of record.  However, as outlined above, the undersigned has concluded that the claimant is significantly more limited than in Dr. Schaff's assessment. Accordingly, Dr. Schaff's medical opinion is given weight to the extent that it is consistent with the residual functional capacity assessment outlined above.

(Dec. 11; Tr. 21).  As described below, this court finds that the ALJ's findings regarding Dr. Schaff's opinion, while somewhat confusing, were not improper and did not undermine his determination that Dwyer was not disabled.

Finally, the ALJ considered the opinion of Dr. Meliszewski, a State agency consultant who completed a review of the medical evidence relating to Dwyer's mental limitations.  (Id.).  The ALJ explained that he was giving only minimal weight to Dr. Meliszewski's opinion that Dwyer did not suffer from a severe mental impairment because he found that it was inconsistent with the record as a whole.  (Id.).  He further explained that he was giving Dwyer the benefit of the doubt regarding her claim of a

12

severe mental impairment, and that the record regarding her psychiatric treatment, while scant, was not so limited that it would preclude a finding that her depression was severe. (See id.).

After explaining the basis for his RFC determination, the ALJ relied on the VE's testimony to determine that "the claimant is capable of performing past relevant work as a cashier[.]"  (Dec. Finding #6; Tr. 21).  Accordingly, the ALJ found that Dwyer was not disabled at step 4 in the sequential analysis, and there was no need to reach the final fifth step in the evaluation process.  (Dec. 12; Tr. 22).

Additional factual details relevant to this court's analysis are described below where appropriate.

## III.  ANALYSIS

### A.    Standard of Review

Dwyer is seeking judicial review of the Commissioner's "final decision" pursuant to the Social Security Act § 205(g), 42 U.S.C. § 405(g) (the "Act").  The Act provides in relevant part that:

> Any individual, after any final decision of the Commissioner of
> Social Security made after a hearing to which he was a party,
> irrespective of the amount in controversy, may obtain a review of
> such decision by a civil action .... The court shall have power to
> enter, upon the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the Commissioner
> of Social Security, with or without remanding the cause for a re-
> hearing.  The findings of the Commissioner of Social Security as to
> any fact, if supported by *substantial evidence*, shall be conclusive ....

42 U.S.C. § 405(g) (emphasis added).  The Supreme Court has defined "substantial

evidence" to mean "'more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  Richardson v.

Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126

(1938)); accord Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st

Cir. 1991).

> It has been explained that:

> > In reviewing the record for substantial evidence, we are to keep in
> > mind that "issues of credibility and the drawing of permissible
> > inference from evidentiary facts are the prime responsibility of the
> > [Commissioner]."  The [Commissioner] may (and, under his
> > regulations, must) take medical evidence.  But the resolution of
> > conflicts in the evidence and the determination of the ultimate
> > question of disability is for him, not for the doctors or for the courts.
> > We must uphold the [Commissioner's] findings in this case if a
> > reasonable mind, reviewing the record as a whole, could accept it as
> > adequate to support his conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting

Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Thus,

the "court's function is a narrow one limited to determining whether there is substantial

evidence to support the [Commissioner's] findings and whether the decision conformed

to statutory requirements."  Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315,

319 (1st Cir. 1981).  The Commissioner's decision must be affirmed, "even if the record

arguably could justify a different conclusion, so long as it is supported by substantial

evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir.

1987), cert. denied, 484 U.S. 1012, 108 S. Ct. 713, 98 L. Ed. 2d 663 (1988).

"Even in the presence of substantial evidence, however, the Court may review

conclusions of law, and invalidate findings of fact that are 'derived by ignoring evidence,

misapplying the law, or judging matters entrusted to experts.'" Musto v. Halter, 135 F.

Supp. 2d 220, 225 (D. Mass. 2001) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.

1999) (per curiam)) (internal citations omitted).  "Thus, if the ALJ made a legal or factual

error, the court may reverse or remand such decision to consider new, material evidence

or to apply the correct legal standard." Ross v. Astrue, Civil Action No. 09-11392-DJC,

2011 WL 2110217, at *2 (D. Mass. May 26, 2011) (internal citation omitted).

## B.    Characterization of Plaintiff's Treatment as "Conservative"

The plaintiff argues that the Commissioner's decision to deny her claim for SSDI

benefits must be reversed because "[t]he ALJ erred when he ruled that Ms. Dwyer was

not disabled because her medical treatment had been conservative."  (Pl. Mem. (Docket

No. 9-1) at 7).  Specifically, the plaintiff asserts that there is no support in the medical

evidence for the ALJ's determination "that since the claimant was not a surgical candi-

date or had not been hospitalized for her medical condition, and received conservative

treatment, she could not have had a disabling physical or mental impairment."  (Id.).

Accordingly, she contends that "[t]he ALJ has improperly taken on the role of medical

doctor and is diagnosing the severity of her conditions based on her treatment." (Id. at 8).

She further contends that the ALJ improperly concluded that Dwyer was not disabled as a

result of her conservative treatment.  (Id.).  For the reasons that follow, this court

concludes that the ALJ's findings regarding the plaintiff's treatment were supported by

substantial evidence in the record, and do not amount to reversible error.

     This court finds, as an initial matter, that Dwyer's arguments misstate the

significance of the ALJ's findings regarding the nature of her treatment.  The ALJ did not

conclude, as the plaintiff argues, that Dwyer was disabled "because her medical treatment

had been conservative."  Rather, the ALJ found, as part of his credibility determination,

that "[t]he relatively routine and conservative nature of the claimant's treatment record"

undermined the plaintiff's claims of disabling pain and other symptoms.  (See Dec. 8; Tr.

18).  Generally, "[t]he credibility determination by the ALJ, who observed the claimant,

evaluated [her] demeanor, and considered how that testimony fit in with the rest of the

evidence, is entitled to deference, especially when supported by specific findings."

Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  Here,

the ALJ made a number of specific findings, in addition to his findings regarding the

conservative nature of Dwyer's treatment, to support his conclusion that the plaintiff's

statements regarding the intensity, persistence, and limiting effects of her symptoms were

not entirely credible.  This court finds that his decision not to credit Dwyer's complaints

of disabling pain and other symptoms was based on substantial evidence, and is therefore

entitled to deference.

     In evaluating the plaintiff's credibility, it was appropriate for the ALJ to consider

the nature of Dwyer's treatment and whether that treatment was consistent with her

16

complaints of disabling symptoms.  See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir.

1994) ("an unexplained inconsistency between the claimant's characterization of the

severity of her condition and the treatment she sought to alleviate that condition is highly

probative of the claimant's credibility"); Velez v. Sec'y of Health & Human Servs., 993

F.2d 1530, 1993 WL 177139, at *6 (1st Cir. May 27, 1993) (unpub. op.) (ALJ's credibil-

ity assessment, based in part upon finding that claimant's allegations "were unsupported

by claimant's 'conservative treatment,'" was entitled to deference).  Moreover, despite

the plaintiff's argument to the contrary, the ALJ's description of Dwyer's treatment as

"conservative" was supported by substantial evidence in the record.

        The record shows that in May 2009, more than a year and a half after the alleged

onset of Dwyer's disability, Dr. Subbiah Doraiswami, a State agency consultant, com-

pleted a physical RFC assessment based on a review of the plaintiff's medical records.

(Tr. 287-94).  Therein, Dr. Doraiswami noted that Dwyer had a primary diagnosis of

fibromyalgia for which she had received "conse[r]vative tr[e]atments," including exercise

and medication.  (Tr. 287-88).  She further noted that Dwyer had received treatment for

her carpal tunnel syndrome, which consisted only of wearing a brace at night, but did not

note any treatment in connection with Dwyer's diagnosis of neuropathy.  (Tr. 288).

Therefore, Dr. Doraiswami's RFC assessment supports the ALJ's finding that Dwyer's

treatment was "essentially routine and conservative in nature[,]" and that the plaintiff had

not been hospitalized or obtained surgery for her physical impairments.  (See Dec. 8; Tr.

18).

17

The record also shows that in December 2009, more than two years after Dwyer's alleged onset date, Dr. Maliszewski reviewed the medical evidence relating to Dwyer's mental health issues and completed a Psychiatric Review Technique form ("PRTF"). (Tr. 307-19). In his consultant's notes set forth in the PRTF, Dr. Maliszewski stated that while Dwyer had been diagnosed with a depressive disorder, her condition was not considered severe. (Tr. 319). He also wrote that Dwyer had no history of treatment as an inpatient in a psychiatric hospital, had received only brief outpatient treatment in 2006, and was receiving medication for her pain and mood from her primary care physician. (Id.). Thus, although the ALJ rejected Dr. Maliszewski's opinion that Dwyer was not suffering from a severe mental impairment, his characterization of Dwyer's treatment as "conservative" was consistent with Dr. Maliszewski's description of the treatment the plaintiff had received for her depression. The plaintiff's assertion that the ALJ assumed the role of medical doctor and improperly substituted his own views for those of the medical professionals is without merit. (See Pl. Mem. at 8).

Even if the ALJ's finding as to the nature of Dwyer's treatment did not have substantial support in the medical evidence, this court finds that it would not undermine his assessment of Dwyer's overall credibility. As described above, the ALJ made a number of additional findings, which support his determination that the plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with his determination of her RFC. For example, the ALJ cited to evidence from the record showing that Dwyer's prescribed

18

medications were effective in limiting her symptoms, as well as to evidence indicating that Dwyer failed to comply with her neurologist's treatment recommendations.  (See Dec. 9; Tr. 19).  Such evidence supports the ALJ's decision not to credit Dwyer's claim of a disabling condition.  See Russell v. Barnhart, 111 Fed. Appx. 26, 27 (1st Cir. 2004) ("A claimant's failure to follow prescribed medical treatment contradicts subjective complaints of disabling conditions").

Additionally, the ALJ noted that the record contained evidence showing that Dwyer was able to carry out various household chores, drive a car without difficulty, and engage in activities such as reading and crafts.  (Dec. 9-10; Tr. 19-21).  He also found it significant that for more than three years after the alleged onset date of her disability, Dwyer spent between 16 and 24 hours per week working at a cashier's job, which required her to remain on her feet at all times and involved scanning and bagging items for customers.  (Dec. 10; Tr. 20).  These specific findings provide further support for the ALJ's determination that Dwyer's subjective complaints of disabling pain and other symptoms were not worthy of belief.  See Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) (the fact that claimant could perform part-time work and engage in household chores "cuts against his claim that he was totally disabled"); Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("evidence of daily activities can be used to support a negative credibility finding").  Accordingly, even if this court were to disregard the ALJ's findings regarding the conservative nature of Dwyer's treatment, his credibility assessment would still be entitled to deference.

19

C.      **The ALJ's Use of the Function Report**

The plaintiff's next challenge concerns the ALJ's use of her Function Report to question Dwyer during the hearing. Specifically, she argues that during his questioning, the ALJ "cherry-picked" information from the Report regarding her activities of daily living, but ignored other information contained in the Report that supported her claim for benefits. (Pl. Mem. at 8-10). She further contends that by questioning her in such an adversarial manner, the ALJ failed to comply with his duty to investigate all of the facts and to develop arguments both for and against the plaintiff's claim for benefits. (Id. at 10). The plaintiff is correct that "Social Security proceedings are inquisitorial rather than adversarial[,]" and that "[i]t is the ALJ's duty to investigate the facts and develop the argument both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 110-11, 120 S. Ct. 2080, 2085, 147 L. Ed. 2d 80 (2000). However, this court finds that the ALJ complied with this obligation, and that in any event, he was entitled to rely on Dwyer's counsel to fill in any gaps in the record.

During the hearing, the ALJ used information from the Function Report to question Dwyer about her activities of daily living. (Tr. 53-63). Thus, the ALJ went through the list of activities that Dwyer said she could perform as of April 2009, and he asked for details regarding the nature of those activities and the extent to which she was still performing them as of the date of the March 2011 hearing. (See id.). Although the ALJ did not ask any specific questions about the symptoms and limitations described in the Function Report, such as Dwyer's complaints of burning pain in her legs during

20

sleeping and difficulties she experienced in connection with her personal care, the ALJ

did allow her to explain how her symptoms adversely impacted her ability to perform

household chores such as laundry and cleaning, and why she was no longer able to

perform some of the activities that were listed in her Function Report, such as shopping

and getting together with friends.  (Tr. 54-55, 57-62, 66-67).  Furthermore, the ALJ

specifically acknowledged the plaintiff's complaints and allegations of disabling symp-

toms in his written decision.  For instance, but without limitation, the ALJ acknowledged

Dwyer's claim that she experiences weakness, fatigue, sleep disturbance, and pain,

including pain and weakness in her upper and lower extremities, as well as generalized

body pain.  (Dec. 7; Tr. 17).  He also acknowledged Dwyer's assertion that her symptoms

"limit[] her ability to perform most physical activities, as exertion typically causes

increased pain and stiffness for several days afterward."  (Id.).  Additionally, the ALJ

noted that Dwyer claims to suffer symptoms of depression relating to her physical

impairments, which limit her ability to participate in activities that she enjoys.  (Id.).  For

instance, the ALJ acknowledged that during her testimony, Dwyer reported that she no

longer meets girlfriends for dinner or participates in her book club.  (Dec. 5; Tr. 15).

Accordingly, the ALJ conducted an appropriate investigation and adequately developed

facts in favor of the plaintiff's claim for benefits.

      To the extent the ALJ's questioning arguably mischaracterized the substance of

Dwyer's Function Report, any such error was remedied by the plaintiff's counsel.

Following the completion of the ALJ's questioning, Dwyer's counsel used the Function

Report to examine the plaintiff about her symptoms and their impact on her ability to carry out her daily activities at the time she completed the Report in April 2009.  (Tr. 71-80).  He also had her describe how often and to what extent she was able to engage in the activities that she listed in the Report.  (Tr. 73-80).  Where, as here, a claimant is represented by counsel, the ALJ is "entitled to rely on claimant's counsel to structure and present claimant's case in a way that claimant's claims are adequately explored."  Faria v. Comm'r of Soc. Sec., 187 F.3d 621 (Table), 1998 WL 1085810, at *1 (1st Cir. Oct. 2, 1998) (per curiam).  Thus, the ALJ cannot be faulted for any shortcomings in his questioning, especially given that Dwyer's counsel thoroughly explored the information contained in the Function Report.  See id. (rejecting claimant's contention that ALJ breached his duty to develop the record by failing to obtain treatment notes or ask further questions where claimant was represented by counsel and failed to show how he was prejudiced by the ALJ's conduct).

### D.    Use of Dr. Schaff's Opinion

Finally, Dwyer contends that the Commissioner's decision must be reversed because "[t]he ALJ's opinion is internally inconsistent insofar as he considers the evidence/opinion of the agency consultant, Dr. Beth Schaff."  (Pl. Mem. at 10).  According to the plaintiff, "[t]he ALJ initially indicated that he found her report credible, but continued by stating that much of the information on which she relied is not applicable and not correct.  He then concluded by limiting her opinion."  (Id.).  Dwyer further argues that the ALJ's decision to credit Dr. Schaff's opinion, "although he did not agree with the

facts upon which it was based," undermines his ultimate conclusion that the plaintiff is not disabled.  (Id. at 11).  This court finds that Dwyer's argument is based on a misunderstanding of the ALJ's decision regarding Dr. Schaff's opinion, and that any confusion created by the ALJ's inconsistent description of the weight he gave to Dr. Schaff's opinion is resolved by reading the ALJ's decision as a whole.  Moreover, since the ALJ concluded that Dwyer's limitations were greater than those found by Dr. Schaff, Dwyer was not harmed by any confusion in the ALJ's discussion.

The record shows that Dr. Schaff completed a physical RFC assessment of the plaintiff on November 10, 2009.  (Tr. 287-02).  Therein, Dr. Schaff opined, based on the available medical evidence, that Dwyer had the capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, to stand and/or walk for about 6 hours in an 8-hour workday, and to sit for about 6 hours in an 8-hour workday.  (Tr. 296).  She also determined that Dwyer was occasionally limited in her ability to climb, balance, stoop, kneel, crouch, and crawl, as well as in her ability to perform grasping and twisting activities with her bilateral upper extremities.  (Tr. 297-98).  However, she found that there were no limitations in Dwyer's ability to push and/or pull, in her visual and communication abilities, or in her ability to endure exposure to workplace hazards or environmental conditions such as fumes, vibrations, humidity and extreme temperatures.  (Tr. 296, 298-99).

In his written opinion, the ALJ accurately described the substance of Dr. Schaff's opinion, and then described the weight that he was giving to her opinion.  (Dec. 11; Tr.

21).  As described above, the ALJ initially stated that he was giving "significant weight" to Dr. Schaff's assessment of Dwyer's physical RFC because it was "well-supported by the objective medical evidence of record."  (Id.).  He then stated that Dwyer was "significantly more limited than in Dr. Schaff's assessment" and that he was giving Dr. Schaff's opinion weight only to the extent that it was consistent with his determination of Dwyer's RFC.  (Id.).  However, the ALJ never stated, nor did he imply, that the medical evidence on which Dr. Schaff relied in rendering her assessment was inapplicable or incorrect.  Therefore, the plaintiff's argument that the ALJ credited Dr. Schaff's conclusion even though "he did not agree with the facts upon which it was based" reflects a misunderstanding of ALJ's decision.

Although the ALJ's description of the weight he was giving to Dr. Schaff's opinion is confusing, it does not constitute reversible error or warrant a remand for further administrative proceedings.  Despite the apparent inconsistency between the ALJ's statement that he was giving Dr. Schaff's opinion "significant weight" and his statement that Dwyer was "significantly more limited than in Dr. Schaff's assessment" so he was giving her opinion weight only "to the extent that is consistent with [his RFC] assessment[,]" it is clear from reading the portions of the decision relating to the ALJ's finding of Dwyer's RFC how the ALJ chose to weigh Dr. Schaff's RFC assessment against other opinion evidence in the record.

When the ALJ's finding regarding Dwyer's RFC is viewed in connection with his discussion of the opinion evidence, it is apparent that the ALJ credited Dr. Schaff's

24

opinion regarding Dwyer's ability to lift and/or carry,[2] as well as her opinion that Dwyer

was occasionally limited in her ability to balance, stoop, crouch, kneel, crawl, and to

perform grasping and twisting activities, but that he otherwise found Dwyer to be more

limited than in Dr. Schaff's assessment.  (Compare Dec. Finding #5; Tr. 16 with Tr. 296-

99).  It is also apparent that the ALJ based the additional physical limitations contained in

his RFC on the opinion of Dr. DeMaria, who assessed the plaintiff as having much more

limited abilities than those described in Dr. Schaff's assessment.[3]  (See Dec. 10-11; Tr.

20-21).  As the ALJ explained in his decision, he decided to give Dr. DeMaria's opinions

"some weight due to her significant treating relationship with the claimant[.]"  (Dec. 10;

Tr. 20).  However, because the ALJ found that there were various inconsistencies

between Dr. DeMaria's assessment of the plaintiff's RFC and the objective and

subjective evidence in the record, he gave it weight only to the extent that it was

---

[2]  As described above, the ALJ found that Dwyer had the RFC to perform light work, as
defined in 20 C.F.R. § 404.1567(b), with certain exceptions.  (Dec. 6; Tr. 16).  20 C.F.R. §
404.1567(b) defines light work to include "lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds."  Thus, the ALJ's conclusion that Dwyer
could perform "light work" is consistent with Dr. Schaff's assessment that Dwyer could lift and/or
carry 20 pounds occasionally and 10 pounds frequently.

[3]  Dr. DeMaria opined that Dwyer could only sit, stand or walk for 1 hour at a time, for a
total of up to 3 hours in an 8-hour workday, could occasionally lift and carry up to 25 pounds and
frequently lift and carry up to 5 pounds, and had no ability to use her hands for simple grasping or
for pushing and pulling of arm controls, but could use her hands for fine manipulation.  (Tr. 426;
see also Dec. 10; Tr. 20).  She also determined that Dwyer was incapable of using her feet to
operate leg controls; could occasionally reach, but could never bend, squat, crawl or climb; and
should never drive automotive equipment or be exposed to unprotected heights, moving
machinery, marked changes in temperature or humidity, dust, fumes or gases.  (Id.).

consistent with his finding regarding Dwyer's RFC.[4]  (Dec. 10-11; Tr. 20-21).  Thus, a

reading of the ALJ's discussion regarding the opinion evidence, and a comparison of that

evidence with the ALJ's RFC finding, demonstrates that the ALJ appropriately reconciled

the inconsistencies in the opinion evidence by giving some weight to Dr. DeMaria's

opinions and some weight to Dr. Schaff's opinions.  See Irlanda Ortiz, 955 F.2d at 769

("the resolution of conflicts in the evidence is for the [Commissioner], not the courts").

Moreover, his decision to credit some of Dr. DeMaria's conclusions rather than adopting

all of Dr. Schaff's assessment was favorable to the plaintiff's claim of disability.

Therefore, Dwyer has not shown that any inconsistency in the ALJ's description of the

weight he gave to Dr. Schaff's opinion had any adverse impact upon her claim or

constituted reversible error.

## IV.  CONCLUSION

For all the reasons described herein, the plaintiff's "Motion to Reverse or Remand

to Social Security Administration" (Docket No. 9) is DENIED and the "Defendant's

Motion to Affirm the Commissioner's Decision" (Docket No. 11) is ALLOWED.

---

[4]  A comparison of the ALJ's RFC determination and Dr. DeMaria's RFC assessment
shows that the ALJ incorporated Dr. DeMaria's opinions to some extent by finding that Dwyer
could not sit or stand/walk for more than 1 hour at a time without changing positions, that Dwyer
could never climb ropes, ladders or scaffolds, that she would need to avoid concentrated exposure
to various hazards such as unprotected heights and dangerous machinery, and that she would need
to avoid exposure to extreme temperatures, humidity, dust, fumes and other pulmonary irritants.
(Compare Dec. Finding #5; Tr. 16 with Tr. 426).

_____/ s / Judith Gail Dein_____
Judith Gail Dein
United States Magistrate Judge